Filed 11/23/21  Asante v. Mensah CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| ELIZABETH ASANTE, | B302729 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YC072403) |
| v. | |
| DEAN A. MENSAH et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ramona G. See, Judge.  Affirmed.

Law Offices of Ronald H. Freshman and Ronald H. Freshman for Defendants and Appellants.

Schwartz & Asiedu and Kwasi A. Asiedu for Plaintiff and Respondent.

Plaintiff and respondent Elizabeth Asante is a native Twi speaker with limited English proficiency. After her husband died in 2002, she repeatedly turned to one of his friends, defendant and appellant Dean Mensah, for assistance with various real estate and financial affairs. Over a period of time, Asante borrowed $11,000 from Mensah. In 2015, Asante discovered that Mensah had put a $24,000 deed of trust on her property in 2012. Mensah refused to remove the deed of trust, telling Asante that her debt to him had ballooned to $76,000. Despite this ongoing dispute over the debt and deed of trust, Asante sought Mensah's assistance when she had an issue with her mortgage company in 2017. Mensah told Asante he would help her if she temporarily put his name on the title to her property. Asante executed a grant deed transferring a 10 percent interest in the property to Mensah; he refused to transfer the interest back to Asante after the mortgage matter was resolved.

Asante sued Mensah and his corporation, Loanfund Exchange, Inc. dba Americo Capital Holdings, alleging causes of action for fraud, quiet title, cancellation of deeds, and declaratory relief, related to both the deed of trust and the grant deed. The matter proceeded to bench trial, after which the court found in favor of Asante on all causes of action. It also granted her motion to add a claim for slander of title, awarded her a net $40,000 in damages, and cancelled both Mensah's deed of trust and the grant deed transferring the 10 percent interest to him. The court later amended the judgment to award Asante attorney fees.

Mensah[1] now contends the judgment must be reversed. He argues that Asante's fraud claims relating to the deed of trust are barred by the statute of limitations. Alternatively, he argues that

---

[1] Loanfund Exchange is not party to this appeal.

2

Asante failed to prove all the elements of those claims. Mensah also argues that Asante failed to prove promissory estoppel as to the grant deed, she was not entitled to relief on her other claims, and she was not entitled to attorney fees. We affirm.

**BACKGROUND**

I. *Complaint*

On October 20, 2017, Asante filed a complaint against Mensah; Mensah's corporation, misidentified as "Americo Capital Holdings"; and 100 Doe defendants.[2] Asante alleged that she became the sole owner of a four-unit apartment building in Lawndale upon the death of her husband, who had advised her to consult his friend, Mensah, for assistance with financial and real estate matters. Asante borrowed $11,000 from Mensah and asked him for help applying to refinance her mortgage and, later, fighting a notice of default from her mortgage servicer, Ocwen. Mensah assisted Asante, but she alleged that his assistance came at a price. In connection with the refinance application, Mensah placed a deed of trust on her property by leading her to believe the deed of trust was one of the many pieces of paperwork she had to sign. In connection with the Ocwen matter, Mensah told Asante he would only be able to help if she temporarily placed his name on the title; after the matter was resolved, he refused to transfer the 10 percent interest back to her. Asante asserted six causes of action pertaining to the deed of trust, the grant deed, and the status of the title to Asante's property.

In her first cause of action for fraud in relation to deed of trust, Asante alleged that "[o]n or about June 15, 2012, defendant

---

[2] Asante later amended the complaint to correctly name Loanfund Exchange as the corporate defendant and dismissed the Doe defendants.

Mensah presented to plaintiff a document for plaintiff's signature. Defendant Mensah told plaintiff the document was part of the papers required for plaintiff's mortgage refinance application." "At the time defendant made the foregoing representation to plaintiff, he knew the statement to be false. In fact, defendant knew the document he presented to plaintiff for her signature was not part of the loan application documents, but rather a Deed of Trust defendant had prepared creating a false debt of $24,000 owed by plaintiff to defendant . . . ." Asante further alleged that she "was unaware the document was not part of the loan refinance application and did not know it was a fraudulently created indebtedness to defendant, secured by her property," Mensah "intended that plaintiff rely on this false representation of the Deed of Trust as being part of the loan refinance application," and she reasonably relied on Mensah's representations because she "trusted defendant Mensah as her financial advisor" and believed he was "acting in her best interest." Asante alleged that she became aware of the fraud in October 2014, when a company from which she attempted to buy solar panels ran a title check on the property. She also alleged that "her property title has been clouded by defendants' fraudulent Deed of Trust, preventing her from obtaining reasonably low interest rates to refinance her mortgage loan," and that she suffered damages in an amount to be proved at trial.

In her second cause of action for fraud—negligent misrepresentation in relation to deed of trust, Asante incorporated the allegations from the first cause of action. She further alleged that Mensah "had no reasonable grounds for believing the representation was true when he made it," "intended plaintiff to rely on his representation, and plaintiff did

4

reasonably rely on defendants' representations." Asante alleged that she was damaged as previously alleged, and that "defendants' representation was a substantial factor in causing plaintiff's harm."

In her third cause of action for fraud—promissory fraud in relation to grant deed, Asante alleged that "Mensah informed plaintiff that in order for him to assist plaintiff to contest a claim by Ocwen, and to appear with her in court proceedings relating to plaintiff's property, plaintiff needed to put him and or defendant Americo, his alter ego 'corporate' entity on title to her property" and "explained that his connection to the property would confer standing on defendant to participate in litigation relating to plaintiff's property." Asante further alleged that Mensah "promised" her that "once the Ocwen case was resolved, he would reconvey whatever interest, title, lien, estate or right to the subject property that had been transferred to him and or his alter ego, defendant Americo, back to plaintiff." She alleged that Mensah knew these representations to be false and "had no intention of performing the terms of the agreement." Instead, he planned to use the interest for his benefit "and or to pressure plaintiff to pay him on his fraudulent Deed of Trust." Asante signed the grant deed Mensah prepared, believing that "Mensah was acting in good faith, and would legitimately help her with the Ocwen claim, and thereafter, reconvey the transferred interest to plaintiff." She alleged her beliefs and reliance on Mensah's statements were reasonable and justified "because Mensah had been her husband's friend prior to his death." Asante alleged damages in an amount to be proven at trial.

In her fourth cause of action to quiet title, in relation to deed of trust and grant deed, Asante sought to quiet title on the

5

Lawndale property. She alleged that defendants had no legal or equitable right to the property, either through the deed of trust or the grant deed, and further alleged that she suffered damages in an amount to be proven at trial. Similarly, in the fifth cause of action for cancellation of deeds, Asante sought to cancel both the deed of trust and the grant deed. In the sixth cause of action for declaratory relief, Asante alleged that both the deed of trust and grant deed were void and sought a judgment declaring the parties' rights and obligations.

II.     *Answer*

After an unsuccessful demurrer, Mensah answered the complaint on April 23, 2019. He entered a general denial to Asante's allegations. Mensah also asserted several affirmative defenses, including the statute of limitations. Most relevant here, he asserted that Asante's claims were barred by Code of Civil Procedure section 338, which requires actions for "relief on the grounds of fraud or mistake" to be brought within three years. (Code Civ. Proc., § 338, subd. (d).)

III.    *Trial*

The matter proceeded to bench trial in 2019. Both Asante and Mensah were represented by counsel. A court reporter was not present, but the parties prepared a settled statement of testimony.

A.     *Asante's Testimony*

1.     *Direct Examination*

Asante testified in Twi, using the assistance of an interpreter.[3] She stated that she received little formal education

_____

[3] In his opening brief, Mensah asserts that Asante "testified in English such that the trial court asked why an interpreter was necessary." Mensah does not provide a record citation in support

6

in her native Ghana, and does not speak, write, read, or understand English very well.  Asante's husband, Jimmy, died in 2002.  Prior to his death, Jimmy engaged in financial and real estate business with Mensah.  He told Asante to ask Mensah for help.  Asante received two real properties from Jimmy: a property in Long Beach and a four-unit apartment in Lawndale.

Asante sold the Long Beach property to Mensah in 2006.  Mensah later told her that either she or Jimmy had a judgment lien of $10,000 on the Long Beach property, and she needed to pay that amount to Mensah.  Mensah told Asante to refinance the mortgage on the Lawndale property, in which she and her sister Mary resided, to get the money.  Asante took Mensah's advice because she trusted him with financial transactions.  Mensah subsequently prepared loan refinance documents and asked Asante to sign them.

Asante signed all the documents Mensah asked her to sign, including those that required notarization.  There were many documents, which Asante signed "several pages at a time, three to four times over."  When presented with the deed of trust in court, Asante testified that she recalled signing it in front of notary Mandy Meza.  Asante "knew" the deed of trust was part of the refinance documentation.  Asante did not know what a deed of trust was, and "believed Mensah must have inserted the Deed of Trust in the pile of refinance documents she signed because she never took a loan of $24,000 from Mensah and did not know she had signed the document creating a debt of $24,000 to

---

of this assertion. He could not, as the record includes no such information.  As Mensah recognizes in his reply brief, "if it is not in the record, it did not happen."  (*Protect Our Water v. County of Merced* (2003) 110 Cal.App.4th 362, 364.)

Mensah." Asante admitted that she had borrowed $11,000 from Mensah: $6,000 to deposit in the bank for refinancing purposes, and $5,000 for unspecified reasons. Ultimately, the refinancing was not successful.

Sometime in October 2015, Asante sought to install solar panels on the Lawndale property. The solar panel company informed Asante it could not finance the project because there was a $24,000 deed of trust on the property, filed by Mensah. Asante testified this was the first she had heard of the deed of trust and Mensah's claim that she owed him $24,000. Asante confronted Mensah, who told her the deed of trust was for money she had borrowed from him. Asante told Mensah she only owed him $11,000.

Asante attempted to get Mensah to remove the deed of trust, but he refused. He told her she now owed him $76,000, because the $24,000 had accrued interest. Asante's sister Mary borrowed $24,000 so that Asante could pay off the lien, but Mensah refused to accept that amount in satisfaction of what he maintained was a $76,000 debt. Asante estimated that she had repaid Mensah "approximately $6,000 or more" but did not present any documentation of the payments.

Sometime in late April 2017, Asante's mortgage company, Ocwen, claimed she owed late charges and issued a notice of default.[4] Asante sought Mensah's assistance to contest the charges in small claims court. Mensah told her that he could speak on her behalf only if his name was on the title to the

_____

[4] This date does not align with the dates on documents from the Ocwen matter, which were admitted into evidence. Those documents indicate the matter was resolved in early April 2017.

8

property. Mensah then prepared a grant deed, which was admitted into evidence. The grant deed transferred 10 percent of the Lawndale property to Mensah's company, Americo Capital Holdings. Asante testified that she only dealt with Mensah, not his company, and that she received no money in exchange for the grant deed. The grant deed, which was signed and dated April 3, 2017, stated that the transfer was a "gift."

After the grant deed was signed, Asante, Mary, and Mensah appeared in small claims court for the Ocwen matter. The matter was settled, and Asante received a $1,000 check as a result. Asante gave the entire check to Mensah for his assistance. She also paid him an additional $1,500 at his request. Asante asked Mensah to reconvey the 10 percent property interest back to her, but he refused. Asante subsequently attempted to refinance her mortgage on at least three occasions, but could not do so because of the deed of trust.

2.      *Cross-Examination*

On cross-examination, Asante testified that she can read limited English, but cannot write in the language. She had been working as a certified nursing assistant (CNA) for over 25 years. Asante took the CNA licensure test in English, after taking a three-month preparation course. Each year, Asante receives two hours of professional training in English, and the documents she deals with on the job are in English. She also stated that she uses English to "give basic instructions" to her coworkers, and took and passed her driver's license exam in English.

Asante reviewed the deed of trust and grant deed on the stand. She stated that the only words on the documents that she could understand were her name and address. Asante testified that she understood the purpose of the grant deed was to make

9

Mensah a part owner of the property so he could speak on her behalf in the Ocwen matter. She understood that Mensah would transfer the interest back to her after the matter concluded. Asante admitted that she asked Mensah for help with the Ocwen matter even though she was angry with him about the deed of trust.

Mensah also questioned Asante regarding a written agreement dated May 3, 2017; the document was admitted into evidence. The May 3, 2017 agreement stated that Asante had relinquished her interest in the $1,000 from Ocwen, and that Mensah was entitled to an additional $1,300 "as additional fees" for his "credit repair and real estate services work regarding 'ELIZABETH ASANTE AND DEAN MENSAH V. OCWEN LOAN SERVICES.'" It further stated that the deed of trust "already has converted into EQUITY interest in the property," "the interest, penalties, legal fees for the loan increases daily till paid off in full," and "I Elizabeth Asante have defaulted the loan agreement signed with Americo's [and] agree that said loan will be paid in full including through refinance OR sale of the subject property." It further provided that Mensah "or 'Americo Holdings' retains Real estate broker rights and is entitled to real estate six percent (6%) broker fees," and would serve as "Broker of record" if Asante sold the property. The final paragraph stated that Asante was "of sound mind and I do understand the above performance or responsibilities to pay of [*sic*] the said lien by Americo Holding dba Dean Mensah on subject property." The document was signed by Asante and notarized, though Asante denied appearing in front of T.B. Iott, the named notary. Asante testified that the only words on the document that she could read

or understand were her name and address. Mensah did not sign the document.

B. *Mary Asante*

Asante called her sister, Mary, as a witness. Through the Twi interpreter, Mary testified that she lived with Asante in the Lawndale property. Mary stated that Mensah was "always asking her sister for money," and had been unsuccessful in helping Asante refinance her mortgage. Mary became aware of the deed of trust on the property when Asante tried to get solar panels installed. Mary testified that Asante was "distressed" about the deed of trust, and was "always feeling harassed by Mensah," who threatened to sell the property to pay it off. Mary asked Mensah about the deed of trust, because she knew Asante owed him only $11,000, not $24,000. He then "explained something about interest to her."

To help Asante, Mary borrowed $24,000 to pay off the deed of trust. Mensah refused to accept the $24,000, telling Mary that Asante owed him $76,000 due to accrued interest.

Mary was aware that Ocwen later "put something on the property." Mary recognized the grant deed, and recalled Mensah telling Asante that he would sign the interest back to her once the Ocwen matter concluded. The matter settled for $1,000, and Mensah asked for an additional $1,500.

There is no indication in the settled statement that Mary was cross-examined. Asante rested after Mary's testimony.

C. *Mensah*

1. *Direct Examination*

Mensah testified that he was a real estate broker and investor. He met Asante through her husband and had known her for about 25 years.

11

Mensah assisted Asante with a successful mortgage refinance in 2004. Asante called him in 2006 to request a loan; Mensah gave her a loan in the form of a $10,000 check at that time. Mensah gave Asante a $5,000 check as a loan in 2009, and an additional $9,000—a $6,000 check and $3,000 in cash—"sometime from 2009 to 2011." Asante told Mensah she would repay the loans once she refinanced her mortgage. She and Mensah agreed that the total $24,000 loaned would be secured by the Lawndale property.

Mensah sent a deed of trust securing the $24,000 in loans to Asante for her signature in June 2012. When Asante mailed the signed and notarized deed of trust back to him, Mensah noticed that the notary stamp was incorrectly placed. Mensah informed Asante of the error, and she agreed to drive to Meza's office to re-sign and notarize the document. Asante and Meza spoke to one another in English. Mensah testified that Asante was a nurse and CNA who could read English.

The deed of trust was recorded on June 15, 2012. A few weeks later, Mensah received a copy of the deed of trust in the mail from the county recorder. Around the same time, Asante called him to tell him that she also received a copy of the deed of trust in the mail. At some point thereafter, Mensah attempted to assist Asante with a mortgage refinance, but she did not qualify due to her bad credit.

In January 2014, Asante called Mensah and asked him to remove the deed of trust so she could get financing for solar panels. She told him she could repay the loan with the proceeds from the solar panel financing, or he could refile the deed of trust after she got the solar panels. Mensah referred Asante to a business acquaintance for a second opinion.

In 2017, Asante came to Mensah's house and asked him for help because her home was in foreclosure. Mensah advised her that she could either refinance the property, sell the property, or hire a lawyer to stop the foreclosure. Later, Asante and Mensah agreed that Asante would add Mensah's company to the property's title so Mensah could negotiate with Ocwen and stop the foreclosure. Mensah prepared a grant deed and sent it to Asante the day before she signed it in front of notary Iott. Mensah accompanied Asante to the signing and heard her speak English with Iott. Mensah ultimately prevented the foreclosure.

2. *Cross-Examination*

On cross-examination, Mensah testified that he bought the Long Beach property from Asante in 2003. He later discovered there was a $12,000 judgment lien from "Discovery credit card" recorded against the property. Mensah did not know why the lien had not been discharged when he bought the property. Mensah gave "various explanations about it being initially a judgment, that only turned into a lien after the title transfer had been recorded."

Mensah testified that the only record he had of the $10,000 loan he made to Asante in 2006 was a "diary entry" he made when Asante came to his office to get the loan. He had no bank records, even though the loan had been in the form of a check; he had destroyed the records because "frankly, they were too old." Alternatively, he might have lost them in a "gas leak." His bank did not have any records of the transaction. Mensah gave essentially the same testimony regarding the absence of records of the $5,000 check he gave Asante in 2009 and the $6,000 check he gave her later. Mensah testified that he and Asante entered a written agreement regarding the final $3,000 he had lent her in

13

cash, but that agreement "was also lost as the other check records had been."

Mensah further testified that the deed of trust was actually in two parts: the recorded portion and a "balloon note" that was separately entered into evidence. The "balloon note" stated that the principal amount of the loan was $31,000, not $24,000. Mensah initially "had no explanation" for the discrepancy, but when cross-examination resumed the next day of trial he stated that the $31,000 represented the $24,000 in principal plus the interest due at the end of the loan period. Mensah mailed the deed of trust to Asante and told her to seek the assistance of counsel while reviewing it.

Mensah testified that he and Asante had an oral agreement regarding the grant deed transferring an interest to him. He used the website Zillow to determine that a 10 percent interest in the property was equivalent to the $24,000 in loans and the interest accrued thereon. Mensah stated that he planned to reconvey the interest to Asante once she paid her debt; he also said he would no longer enforce the deed of trust at that time. Mensah did not report the "gift" of the 10 percent property interest on his corporation's tax return.

### 3. *Redirect Examination*

On redirect examination, Mensah explained that the $1,000 and $1,500 payments Asante gave him after the Ocwen matter were "to pay the person who prepared the documents for the small claims and federal case against Ocwen."

### D. *Closing Arguments*

Asante and defendants made their closing arguments in written briefs. In her brief, Asante asserted that Mensah had "absolutely no credibility." She contended that the deed of trust

14

was void due to a lack of consideration,[5] or, in the alternative, that the evidence supported her causes of action for fraud. Asante also argued that she proved fraud as to the grant deed, and that at the very least Mensah breached their agreement by failing to reconvey the interest to her. Asante asserted that she suffered economic damages because she was unable to procure refinancing or solar panels due to the deed of trust. She did not place a monetary value on these damages; she instead requested $33,044.82 for litigation-related attorney fees and costs such as the interpreter's fee. Asante further asserted that she suffered "mental anguish, distress and frustration," and sought punitive damages of $219,397.28. She asked the court to "expunge" both the deed of trust and the grant deed.

In their closing brief, Mensah and Loanfund Exchange argued that Asante's fraud claims related to the deed of trust were time-barred under the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (d). They asserted the limitations period began running in 2012, either when Asante signed the deed of trust or when she received the recorded copy in the mail a few weeks later. They cited Government Code section 27297.6 for the proposition that the county recorder had a duty to mail such copies to deed of trust signatories. Defendants contended Asante failed to prove fraud with respect to the grant deed, because she failed to present evidence that Mensah had fraudulent intent or that she

---

[5] Asante acknowledged that she did not plead a cause of action for breach of contract, but asked the court to amend the pleadings to conform to proof because "the absence of consideration renders the contract for the [deed of trust] void *ab initio*."

15

reasonably relied on his representations.  Defendants also contended that Asante's "claimed inability to read English is not credible," as she obtained CNA licensing credentials and continuing education in English and successfully held her job for over 25 years.  Defendants further argued that they controverted "each fact" pertinent to "any legal theory" Asante had presented, and Asante failed to meet her burden of proof on her causes of action for quiet title and declaratory relief.

In rebuttal, Asante argued that her fraud claims concerning the deed of trust were timely, because she was unaware of the fraud until October 2015.  She asserted that Government Code section 27297.6 was not in force at the time the deed of trust was signed and challenged the credibility of Mensah's testimony that she called to tell him she received the deed of trust in the mail.  Asante also urged the court to reject defendants' claims that she was proficient in English.  She further asserted that she had presented adequate circumstantial evidence of Mensah's intent to defraud her.

IV.    *Ruling and Judgment*

The trial court issued a written ruling in Asante's favor on August 15, 2019.  The court squarely rejected defendants' statute of limitations defense on the deed of trust claims.  It stated that it "believes Plaintiff's testimony that she did not understand what she was signing and that she believed all of Mensah's representations."  The court also expressly found credible Asante's testimony that she lacked proficiency in English and was unaware of the deed of trust until it was brought to her attention by the solar panel company in October 2015.  The court credited Asante's testimony that she did not receive copies of the deed of trust from Mensah or anyone else, and further accepted

16

her representation that Government Code section 27297.6 was not in effect when the deed of trust was recorded. In light of these findings, the court found that Asante "did not discover the transfer had occurred until it was brought to her attention by the solar company representative in October 2015. Therefore, the Court finds the applicable statute of limitations was tolled until October 2015 when Plaintiff was informed by the solar company of the deed transfer and the Court finds Plaintiff's claims are not barred by the statute of limitations codified in [Code of Civil Procedure] section 338."

The court further concluded that Asante proved her fraud claims pertaining to both the deed of trust and the grant deed. It found that Asante "could not read the subject documents because she is not conversant enough in English," and "trusted Defendants because Mensah was a friend of her husband and he told her to go to Defendants for assistance when she needed it." It further found it was "unfathomable" for Mensah, a "real estate broker and real estate investor," "not to keep records of loans he made to Plaintiff." Without such records, the court found there was "simply no basis upon which to find that such a loan occurred nor that there was sufficient consideration for Defendants to obtain any percentage interest in Plaintiff's property. The only uncontroverted amount loaned is $11,000."

The court also found Asante's "explanation that the transfer was temporary and made to allow Mensah [to] assist Plaintiff in arguing her small claims case because she was incapable of doing so herself . . . more believable than Mensah's explanation." It concluded that "Mensah saw an opportunity to get his hands on a valuable piece of property with a plaintiff who was not very savvy in real estate matters and merely received

17

this property when her husband died. She never managed the property while her husband was alive as her husband was in charge of such matters. Further, she was not required to speak or read advanced English given she is a [CNA] despite Mensah's claim to the contrary. If Plaintiff was in fact so savvy in real estate matters and so fluent in English, why would she need Mensah's help at all? . . . If Plaintiff could not read and fully understand the documents and the contents were not as represented, these circumstances make her signature a nullity."

The court additionally found that "Mensah's actions were committed with the intent to deceive Plaintiff into deeding a portion of her Property to him so that he could force her to either buy him out or force a sale of the Property for a windfall." It found that defendants "had Plaintiff signing document after document for phantom monies owed without any documentation that there was a transfer of such funds to Plaintiff," and that those documents, including the deed of trust, the "balloon note," and the May 3, 2017 agreement, "demonstrate clear fraud at its worst." It continued, "The Court finds these documents demonstrate a clear plan and design to obtain as much money and/or property from Plaintiff as possible knowing that Plaintiff did not understand what she was signing, did not understand the legal implications of these documents, and Defendants' misrepresentations regarding the same only lulled her into a false sense of safety and protection to her detriment."

The court concluded Asante "was damaged in the total amount of $50,000.00." It rejected her testimony that she paid back $5,000 of the $11,000 she borrowed from Mensah because she, too, lacked documentation of the putative transactions. The court found undisputed, however, that Mensah received $1,000

18

after the Ocwen matter.  It accordingly found that Asante "still owes Defendants $10,000.00," effectively reducing her award to $40,000.  The court denied punitive damages, as no evidence of defendants' net worth had been presented.

The court also found that Asante carried her burden of proof on her causes of action for quiet title, cancellation of deeds, and slander of title.  It reiterated that "Mensah deceived Plaintiff into believing that the transfer was only temporary, and there was thus no meeting of the minds between these parties regarding such a transfer, and that the transfer was not supported by sufficient consideration."  The court accordingly quieted title in Asante's name and cancelled both the deed of trust and the grant deed.  It granted Asante's request for declaratory relief as well.

Judgment was filed on September 24, 2019.  Contrary to Mensah's assertion on appeal, the judgment accounted for the $10,000 Asante owed Mensah by expressly stating that it was "in the net amount of $40,000."

Mensah filed a notice of appeal on November 25, 2019.

V.    *Attorney Fees*

Asante filed a motion for attorney fees on September 19, 2019; the motion is not in the appellate record.  The trial court granted the motion on January 21, 2020, awarding Asante $40,590 in attorney fees in accordance with a provision in the deed of trust.

On February 13, 2020, the court issued an amended judgment adding the attorney fees award as well as $5,871.85 in costs.  Mensah did not file another notice of appeal.

19

## DISCUSSION

I.    *Standard of Review*

Neither party requested, and the court did not issue, a formal statement of decision pursuant to Code of Civil Procedure section 632.  In the absence of a statement of decision, we look only to the judgment to determine error.  (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 268.)  We do not turn a blind eye to the record before us; we may examine the trial court's memorandum decision to help interpret the court's findings or conclusions.  However, we do not use it in determining the ultimate question of whether the judgment and findings implied thereby are supported by substantial evidence.  (*Id.* at pp. 267, 269.)  In making that determination, we indulge all intendments and presumptions on matters as to which the record is silent.  (*Id.* at p. 267.)  We affirm a judgment that is correct on any legal basis, even if that basis was not invoked by the trial court.  (*Id.* at p. 269.)  We do not reweigh evidence or reassess the credibility of witnesses; the trial court is the sole judge of witness credibility. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.)

II.   *Deed of Trust Causes of Action*

A.    *Statute of Limitations*

Mensah contends that Asante's fraud and negligent misrepresentation causes of action relating to the deed of trust are barred by the three-year statute of limitations in Code of Civil Procedure section 338, subdivision (d).  He argues that Asante either obtained actual knowledge of the deed of trust when she signed it on June 14, 2012, or constructive knowledge a few weeks later when the recorder mailed it to her as required by Government Code section 27297.6.  Therefore, he asserts, the

20

statute of limitations began running in June 2012 and expired in June 2015, two years before Asante filed her complaint. We disagree.

Statutes of limitations "prescribe the periods beyond which a plaintiff may not bring a cause of action." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 806 (*Fox*).) They begin to run when a cause of action "accrues," or when all the elements of the cause of action are complete. (*Ibid.*) "An important exception to the general rule of accrual is the 'discovery rule,' which postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Id.* at p. 807.) A plaintiff has reason to discover a cause of action when he or she has reason to at least suspect a factual basis for the elements of the cause of action. (*Ibid.*) "Rather than examining whether the plaintiffs suspect facts supporting each specific legal element of a particular cause of action, we look to whether the plaintiffs have reason to at least suspect that a type of wrongdoing has injured them." (*Ibid.*) Essentially, the discovery rule delays accrual until the plaintiff has or should have inquiry notice of the cause of action. (*Ibid.*) "Resolution of the statute of limitations issue is normally a question of fact." (*Id.* at p. 810.)

The causes of action here are common law fraud and negligent misrepresentation. The elements of fraud are (1) a misrepresentation by the defendant, (2) with knowledge of its falsity (also known as "scienter"), (3) with the intent to induce reliance on the misrepresentation, (4) justifiable reliance by the plaintiff, and (5) resultant damage. (*Conroy v. Regents of the University of California* (2009) 45 Cal.4th 1244, 1255 (*Conroy*); *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638.) Negligent misrepresentation, "a species" of fraud, "does not require intent

21

to defraud but only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (*Conroy*, *supra*, 45 Cal.4th at p. 1255.)

Mensah appears to contend that Asante knew or should have known of either (or both) the elements of misrepresentation or damage long before October 2015. Substantial evidence supports the trial court's implied findings otherwise. Asante testified that she did not understand what the deed of trust said, believed it to be one of many forms she needed to sign to apply for a mortgage refinance, and did not learn the import of the document until the solar company checked her title. We do not revisit the trial court's finding that this testimony was credible.

Mensah argues that the statute of limitations began running when Asante signed the deed of trust, because the notary stamp on the document verified that Asante knew she was signing the document. This argument and the authority Mensah cites in support are not persuasive. Asante did not dispute that she signed the document; the relevant contested issue was whether she understood its contents. Substantial evidence regarding her lack of formal education, inability to read English, and reliance on Mensah's expertise and representations supports the conclusion that she did not.

Mensah also contends that Asante acquired constructive notice of the deed of trust when she received a copy of the deed of trust in the mail. He argues that Civil Code section 1213 and Government Code section 27297.6 establish a presumption of notice that Asante failed to overcome.

Civil Code section 1213 states, "Every conveyance of real property . . . acknowledged or proved and certified and recorded as prescribed by law from the time it is filed with the recorder for

22

record is constructive notice of the contents thereof to subsequent purchasers and mortgagees. . . ." (Civ. Code, § 1213.) A deed of trust is a "conveyance" for purposes of Civil Code section 1213 (Civ. Code, § 1215), but Asante was not a "subsequent purchaser or mortgagee" of the property. To the contrary, she was the mortgagor of the property.

The version of Government Code section 27297.6, subdivision (a) in effect[6] when the deed of trust was signed and recorded provided, in relevant part, "(1) Following adoption of an authorizing resolution by the Los Angeles County Board of Supervisors, the Los Angeles County Recorder, or a designee or designees authorized by the board of supervisors, may notify one or more of the following by mail: (A) The party or parties executing a deed, quitclaim deed, or deed of trust, within 30 days of recordation." (Former Gov. Code, § 27297.6, subd. (a) [effective Jan. 1, 2012-Dec. 31, 2014].) Mensah asserts this statute imposed on the recorder a duty to mail copies of the recorded deed of trust, Evidence Code section 664[7] established a presumption that the duty was performed regularly, and Evidence Code section 641[8]

---

[6] Asante's assertion that Government Code section 27297.6 did not come into existence until 2015 is incorrect. So too was the trial court's apparent acceptance of that assertion. As noted above, however, we look for error only in the judgment, not the trial court's written ruling.

[7] Evidence Code section 664 provides, "It is presumed that official duty has been regularly performed. This presumption does not apply on an issue as to the lawfulness of an arrest if it is found or otherwise established that the arrest was made without a warrant."

[8] Evidence Code section 641 provides, "A letter correctly addressed and properly mailed is presumed to have been received in the ordinary course of mail."

established a presumption that Asante timely received the mailed deed of trust.  Therefore, we must presume Asante had notice of the deed of trust.

This chain of reasoning falls apart at the first link.  Nothing in the text of former (or current) Government Code section 27297.6 obligates the recorder to mail the deed.  The statute says that *if* the Board of Supervisors adopts a resolution, an event about which Mensah provides no information, then the recorder *may* notify the party executing a deed of trust by mail.  Even assuming the Board of Supervisors adopted a qualifying resolution, "[i]t is a well-settled principle of statutory construction that the word 'may' is ordinarily construed as permissive, whereas 'shall' is ordinarily constructed as mandatory. . . ."  (*Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 443; see also *People v. Chubbuck* (2019) 43 Cal.App.5th 1, 7 ["In its plain meaning, the term 'may' references permissive conduct, or conduct which is optionally exercised."].)  Nothing in the statute obligates the recorder to mail a recorded deed of trust.  Moreover, even if it did, the record contains substantial evidence to rebut the presumption Asante received it in due course—Asante and Mary both testified that the first time they heard of the deed of trust was in October 2015.  We reasonably infer from this testimony that Asante did not receive a copy of the deed of trust in the mail and was not placed on inquiry notice of its existence.

B.      *Proof of Elements*

Mensah alternatively argues that Asante failed to prove each of the elements of the fraud cause of action.  He primarily argues that Asante "failed to establish what statements or acts by Appellant constituted fraud," but also disputes the extent of

her proficiency in English and the adequacy of her proof of the other elements of fraud.

The judgment states: "The Court finds Defendant DEAN MENSAH defrauded Plaintiff ELIZABETH ASANTE and therefore finds in favor of Plaintiff, ELIZABETH ASANTE and against Defendants, DEAN MENSAH, LOANFUND EXCHANGE, dba AMERICO CAPITAL HOLDINGS, on Plaintiff's First, Second, and Third Causes of Action for Fraud." We presume this judgment is correct, and consider only whether substantial evidence in the record supports the necessary implied factual findings.

As noted above, the elements of fraud are (1) a misrepresentation by the defendant, (2) with knowledge of its falsity, (3) with the intent to induce reliance on the misrepresentation, (4) justifiable reliance by the plaintiff, and (5) resultant damage. (*Conroy*, *supra*, 45 Cal.4th at p. 1255.) Substantial evidence in the record supports factual findings on each of these elements. Asante testified that the deed of trust was one of many documents she signed while attempting to refinance her mortgage. Mensah prepared the documents and told her to sign them, and his experience as a real estate broker and investor gives rise to a reasonable inference that he knew a deed of trust was not a document necessary for a refinance. He intended Asante to rely on his representations about the deed of trust, because he knew she required assistance with financial matters. Asante, who was unable to read the documents, understood that she was pursuing a mortgage refinance and justifiably relied on Mensah, whom she trusted as a friend of her late husband, when he represented that the deed of trust was just another document she needed to sign. Asante testified the

25

deed of trust rendered her unable to obtain solar panels or refinance her mortgage on later occasions, causing her financial harm.

Mensah argues that Asante failed to prove he made any misrepresentation, because she "simply relied on the conclusory allegation that Appellant had represented the deed of trust was necessary for refinance" and did not tell him she could not read English or request that he read the document to her.  The misrepresentation was that the deed of trust was just a document necessary for refinance.  The arbitration case Mensah cites, *Madden v. Kaiser Foundation Hospitals* (1976) 17 Cal.3d 699, does not support his suggestion that more was required. Mensah cites other case law for the proposition that "'one who accepts or signs an instrument, which on its face is a contract, is deemed to assent to all its terms, and cannot escape liability on the ground that he has not read it.  If he cannot read, he should have it read or explained to him.'" (*Randas v. YMCA of Metropolitan Los Angeles* (1993) 17 Cal.App.4th 158, 163 (*Randas*) (quoting 1 Witkin, Summary of Cal. Law (9th ed. 1987) § 120, p. 145).)  This ignores the evidence showing that Asante believed the deed of trust had been explained to her—it was a refinancing document. As Asante points out, the very next citation in *Randas* states, "'One who signs an instrument when for some reason, such as illiteracy or blindness, he cannot read it, will be bound by its terms in case the other party acts in good faith *without trick or misrepresentation*.'" (*Randas*, *supra*, 17 Cal.App.4th at p. 163, emphasis added.)  In other words, the misrepresentation may negate the signatory's obligation to inquire about the terms of the document.

Mensah nevertheless contends "illiteracy was not a basis for fraud" and asserts that Asante exaggerated the extent of her illiteracy in any event. Relying primarily on his own testimony, plus inconsistencies in Asante's, he argues the evidence showed Asante "knew she was signing a contract because she appeared before a notary to have it signed; the evidence shows that she received a copy of the recorded deed of trust and therefore, under California law had sufficient evidence to inquire into the document with an attorney but chose not to." As stated previously, we do not reweigh the trial court's credibility determinations, and substantial evidence supported the court's ultimate ruling. Mensah poses a series of questions about evidence "[c]onspicuously absent from the testimony," such as "what happen [*sic*] with the other documents in the finance application? Who read those to Respondent? Who filled them out?" The appropriate time and place to ask such questions was during cross-examination of Asante; the settled statement indicates this line of questioning was not pursued.

Mensah next argues there was no knowledge of falsity because the evidence showed that Asante borrowed money from him, and she was unable to demonstrate that she had repaid the loans. Therefore, he suggests, the deed of trust legitimately secured a loan, and "the court erred in claiming the loan was a 'phantom loan.'" The falsity at issue here was not that the deed of trust secured a loan, but rather that the deed of trust was not the refinancing document Mensah represented it to be. Substantial evidence supported the conclusion that Mensah, who prepared the deed of trust and was experienced in real estate matters, knew that the deed of trust was not a document Asante needed to sign to apply for mortgage refinancing. Mensah

27

additionally "admits he intended for Respondent to sign the Note and Deed of Trust." Even if the falsity at issue were whether the deed of trust secured a loan, substantial evidence supported the court's conclusion that Asante borrowed only $11,000, not $24,000 or $31,000, from Mensah.

Mensah further contends Asante failed to "establish what the [false] statement was, when it was made, by what means the representation was tendered or how it was tendered. Respondent's sole testimony was Appellant 'slipped it into a pile of documents' or told her it was necessary for the refinance." In the very next sentence, however, he acknowledges that "[t]he court believed Respondent." On the record before us, that belief is sufficient to support the judgment. Mensah also argues that the cause of action for negligent misrepresentation requires an affirmative statement, not an implied assertion, and any statement that the deed of trust was necessary for the refinance fell into the latter category. We are not persuaded. Telling someone a deed of trust is simply a document necessary for refinancing is an affirmative act, not a passive implication or omission.

Finally, Mensah contends that Asante failed to establish causation. In the context of fraud, causation requires proof that the defendant's conduct was a substantial factor in bringing about harm to the plaintiff. (*Knutson v. Foster* (2018) 25 Cal.App.5th 1075, 1091-1092.) Here, the immediate harm to Asante was the encumbrance of her property with the deed of trust. She also testified, despite Mensah's claim to the contrary, that she later attempted to procure solar panels and refinance her mortgage on at least three occasions, but could not due to the deed of trust. A reasonable factfinder could infer that the deed of

28

trust encumbering the property was a substantial factor in these denials, even if, as Mensah points out, the evidence also showed that Asante "was consistently having issues with her mortgage."

The judgment regarding the deed of trust causes of action is affirmed.

III.    *Grant Deed Cause of Action*

The court ruled in Asante's favor on her third cause of action for fraud—promissory estoppel relating to the 2017 grant deed. Mensah contends this was error, because his oral promise to reconvey the 10 percent interest in the property was superseded by the written agreement Asante signed on May 3, 2017.

Promissory estoppel is an equitable doctrine that provides for the enforcement of promises that are otherwise unenforceable due to a lack of consideration. (*US Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887, 902.)  The elements of a promissory estoppel claim are (1) a promise that is clear and unambiguous in its terms, (2) reasonable and foreseeable reliance by the party to whom the promise is made, and (3) injury to the relying party caused by his or her reliance.  (*Id.* at p. 901.)  The judgment in favor of Asante on this claim implies factual findings on all three elements, and substantial evidence supports such findings. Asante testified, and Mensah concedes in his opening brief, that "when Respondent conveyed the 10% interest through the 2017 Grant Deed, it was the intent of the parties at the conclusion of the dispute with Ocwen, Appellant would reconvey the 10% back to Respondent."  This is a clear and unambiguous promise.  The evidence showed that Mensah already had a deed of trust on the property, so a factfinder could infer it was reasonable for Asante to believe he did not need an additional

29

interest in the long term. The evidence also showed that Asante paid Mensah for his assistance with the Ocwen matter; she reasonably could infer this payment would satisfy any obligation she had to him after the matter was resolved. Asante was injured by the loss of a 10 percent interest in her property.

Mensah argues that the May 3, 2017 agreement, which he prepared but did not sign, superseded his oral promise to reconvey the interest. He points to Civil Code section 1625, which codifies the parol evidence rule, and *Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Association* (2013) 55 Cal.4th 1169, 1180-1181, which holds that parol evidence is always admissible to prove fraud. These authorities are inapt. The May 3, 2017 agreement does not purport to be an integrated writing that supersedes the previous promise. To the contrary, it does not mention the grant deed or the promise regarding reconveyance at all. Instead, it states that "America's lien on [the property] already has converted into EQUITY interest in the property." The only lien Americo held on the property was the deed of trust, not the grant deed. Mensah testified in accordance with this at trial, stating "the Deed of Trust was converted to a 10% interest in the subject property" pursuant to the May 3, 2017 agreement and "the Grant Deed would be reconveyed once Asante paid Mensah." Moreover, the May 3, 2017 document is not an agreement between two parties so much as a putative declaration by Asante, its only signatory—and she testified that she could not read or understand the document.

The judgment regarding the grant deed cause of action is affirmed.

IV.   *Remaining Causes of Action*

Mensah contends that Asante should not have prevailed on her causes of action for quiet title, cancellation of deeds, and slander of title because they were based on the fraud claims that were either time-barred or not proven.  We reject these contentions, as the above discussion demonstrates that the fraud claims were proven and were not barred by the statute of limitations.

Mensah also contends the trial court lacked jurisdiction to adjudicate the quiet title cause of action, because Asante did not verify her complaint.  Code of Civil Procedure section 761.020 provides that a complaint asserting a cause of action for quiet title "shall be verified." Despite this requirement, neither the complaint nor answers in this matter were verified.  However, "verification of a complaint is not a jurisdictional requirement." (*United Farm Workers of America, AFL-CIO v. Agricultural Labor Relations Board* (1985) 37 Cal.3d 912, 915.)  Even when verification is required by statute, failure to verify a pleading "is a mere defect curable by amendment."  (*Ibid.*)  "'[T]he proper objection where a party fails to verify a pleading is a motion to strike which may be made only upon timely notice and provides for hearing and extension of time to answer.'"  (*Zavala v. Board of Trustees of the Leland Stanford, Jr. University* (1993) 16 Cal.App.4th 1755, 1761.)  Where, as here, no such motion is filed and the matter proceeds to trial, objection to the pleading error is subsequently forfeited.  (*Ibid.*)

The judgment regarding the quiet title, cancellation of deed, and slander of title causes of action is affirmed.

V.    *Damages and Attorney Fees*

Mensah contends the award of damages must be reversed because it is supported by "absolutely no testimony."  We disagree.  To the extent the damages were compensatory in nature, Asante testified about the size of her mortgage payment and her inability to refinance the loan.  To the extent the damages were noneconomic, as is suggested by the court's written ruling, "the testimony of a single person, *including the plaintiff*, may be sufficient to support an award of emotional distress damages" if credited by the factfinder.  (*Knutson v. Foster*, *supra*, 25 Cal.App.5th at p. 1096 [emphasis in original].) We do not revisit the trial court's credibility determinations.

Finally, Mensah argues that the attorney fee award—which he did not separately appeal—should be reversed because he demonstrated that Asante is not the prevailing party.  Because we have not reversed any portion of the judgment, we reject this argument.

## DISPOSITION

The judgment is affirmed.  Respondent is awarded costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


WILLHITE, ACTING P.J.


CURREY, J.

32